Jonathan Smale, Oregon Bar No. 091518
Field Jerger LLP
American Bank Building
621 SW Morrison Street, Suite 510
Portland, OR 97205
(503) 542-2015
jonathan@fieldjerger.com

MICHAEL RAY HARRIS, *pro hac vice pending* (Colorado Bar No. 35395)
COURTNEY MCVEAN, *pro hac vice pending* (Colorado Bar No. 48358)
Friends of Animals
Western Region Office
7500 E. Arapahoe Road, Suite 385
Centennial, CO 80112
(720) 949-7791
michaelharris@friendsofanimals.org
courtney.mcvean@friendsofanimals.org

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PENDLETON DIVISION

FRIENDS OF ANIMALS, a New York not-
for-profit corporation,

     Plaintiff,

v.

JEFFREY ROSE, in his official capacity
as the Burns District Office Manager,

and

THE UNITED STATES BUREAU
OF LAND MANAGEMENT, an agency
of the United States,

     Defendants.

_____

Case No:  18-1850

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

1

COMPLAINT

## INTRODUCTION

1.      Plaintiff, Friends of Animals, brings this action on its own behalf and on behalf of its adversely affected members against the United States Bureau of Land Management (BLM) and Jeffrey Rose, BLM's Burns District Office Manager, to challenge BLM's September 12, 2018 Decision Record and Finding of No Significant Impact, for the Warm Springs Spay Feasibility and On-Range Behavioral Outcomes Assessment and Warm Springs Horse Management Area (HMA) Population Management Plan, DOI-BLM-ORWA-B0S0-2018-0016-EA (hereinafter, "Sterilization Experiment and Ten-Year Plan" or "Decision").

2.      The Sterilization Experiment and Ten-Year Plan authorizes an initial roundup of 100 percent of the population, ovariectomizing (spaying or sterilizing by removing the ovaries) 100 wild mares, and the creation of a zoo-like herd management area (HMA) with the return of sterilized and unsterilized wild mares, as well as stallions, separated by a fence. The two separate populations, one side with sterilized mares and the other with unsterilized mares, will total 100 wild horses on each side. Additionally, the Decision authorizes multiple roundups, removals, ovariectomies, and possible use of the pesticide porcine zona pellucida (PZP) for the next ten years or more.

3.      In adopting the Sterilization Experiment and Ten-Year Plan, BLM disregards, without explanation, its statutory and regulatory obligations to: (1) undertake roundup specific analysis of wild horses and their habitat, and to ensure public participation in such decisions; (2) manage wild horses at the minimal feasible level; and (3) conduct

2

management activities affecting wild horses with the goal of maintaining free-roaming behavior.

4.      Under the Decision, no further analysis of the wild horses and their habitats is required, and no public notice and opportunity to comment will be provided before future roundups, future ovariectomies, and/or any future application of fertility control.

5.      The Decision identifies and analyzes the initial helicopter roundup of 100 percent of the total wild horse population, or approximately 694 adult wild horses plus 158 foals. Following the completion of the Sterilization Study, in 2022, BLM would conduct another helicopter roundup to low appropriate management level (AML). The number of horses rounded up and removed would be adjusted based on the "estimated" herd size at that time. Additional helicopter roundups of wild horses would take place in the years that follow at any time the BLM "estimates" that wild horses may have reached the high end of AML. The Decision does not address the specifics of any of the future roundups that are authorized by the plan, and there is no indication that the public will be notified or given the opportunity to comment on any of the future roundups.

6.      The Decision also authorizes continued ovariectomies or other forms of fertility control over the course of ten years without any public involvement.

7.      The Wild Free-Roaming Horses and Burros Act (WHBA) and BLM's guidance documents require that decisions to round up wild horses be based on **current** information, and that management be at the minimal feasible level. 16 U.S.C. § 1333(a), (b)(2); *see also* BLM, Range Management Removal Manual, MS-4720 (2010) (hereinafter, "BLM Removal Manual"), § 4720.01. BLM must make a determination that wild horses are excess and removal is necessary prior to removing wild horses. 16 U.S.C. § 1333(b).

3

COMPLAINT

8.     BLM's guidance also requires that BLM provide a site-specific National Environmental Policy Act (NEPA) analysis for each roundup decision and provide the public with opportunity to comment on such decisions. BLM, Wild Horses and Burros Management Handbook H-4700-1 (2010) (hereinafter, "BLM WHB Handbook") § 2.5. BLM guidance mandates that BLM issue roundup decisions thirty-one to seventy-six days before the proposed start date of the roundup, absent an emergency. BLM Removal Manual, § 4720.36; *see also* BLM WHB Handbook § 7.1.2.2.

9.     Citing this guidance, this Court recently stated that "before BLM can conduct a future gather, it must provide notice of its decision" within this timeframe and "provide an opportunity for administrative review of the decision." *Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131, 135 (D.D.C. 2017).

10.     In adopting the Sterilization Experiment and Ten-Year Plan, BLM disregarded these obligations without explanation.

11.     Basing removal actions on the number of horses alone is not sufficient justification to find that wild horses are "excess" and that it is necessary to remove the wild horses from public lands. *See Col. Wild Horse and Burro Coalition, Inc. v. Salazar*, 639 F. Supp. 2d 87, 96 (D.D.C. 2009) (finding it "difficult to think of a 'management activity' that is farther from a 'minimal feasible level' than removal").

12.     By conducting an unethical and ill-informed experiment on healthy wild horses in an area with plentiful forage for all species, by ignoring its obligations to manage wild horses at the minimal feasible level, and by refusing to allow the wild horses within Warm Springs HMA to maintain their wild and free-roaming behavior, BLM is in violation of both the WHBA and NEPA.

4

COMPLAINT

13.     For these reasons, as further alleged below, Friends of Animals seek a declaration from the Court that BLM violated the WHBA and NEPA. Friends of Animals further requests that the Court vacate and remand the Sterilization Experiment and Ten-Year Plan, and prohibit the actions authorized by this Decision, including removing wild horses from in and around Warm Springs HMA, ovariectomizing mares either during the experiment or after the experiment, conducting the feasibility study, and using any type of fertility control method on the wild horses in and around Warm Springs HMA.

### PARTIES

14.     Friends of Animals is a nonprofit, international animal advocacy organization incorporated in the state of New York since 1957. Friends of Animals has nearly 200,000 members worldwide. Friends of Animals and its members seek to free animals from cruelty and exploitation around the world, and to promote a respectful view of nonhuman, free-living and domestic animals. Friends of Animals informs its members about animal advocacy issues and its progress in addressing them through its magazine, *ActionLine*, its website, social media, and public events. Friends of Animals regularly advocate for the right of wild horses to live freely on public lands, and for more transparency and accountability in BLM's "management" of wild horses and burros.

15.     Friends of Animals and its members have a significant interest in the wild horses in Warm Springs HMA. For example, Friends of Animals' member Jullien McVean visited Warm Springs HMA in June 2018. Mr. McVean enjoys visiting HMAs to observe and photograph wild horses, and has visited numerous HMAs across Oregon, including Warm Springs HMA. In June 2018, Mr. McVean drove for over six hours across Warm Springs HMA in search of the over 800 wild horse that, at the time, BLM claimed were within the HMA.

COMPLAINT

Mr. McVean observed several areas of lush vegetation, multiple water sources, numerous bird species, and several hundred cows. However, for unknown reasons, the allegedly large population of wild horses eluded him. It was not until Mr. McVean was preparing to leave Warm Springs HMA that he saw two spectacular wild horses, a stallion and a mare. Because Mr. McVean was unable to observe more wild horses, he looked forward to returning to Warm Springs HMA the following year. Indeed, many of Friends of Animals' other members and staff also enjoy observing and photographing wild horses in Warm Springs HMA. Mr. McVean and other members' professional and recreational interests in observing, studying, and photographing the wild horses would be significantly injured if BLM proceeds with the proposed Sterilization Experiment and Ten-Year Plan. Friends of Animals members' injuries are fairly traceable to BLM's conduct and would be redressed by the relief sought by Friends of Animals in this case.

16.     Defendant, Jeffrey Rose, is the District Manager of BLM's Burns District Office. Defendant Rose oversees wild horse management activities in Warm Springs HMA. Defendant Rose authorized and signed the Sterilization Experiment and Ten-Year Plan and the corresponding Finding of No Significant Impact.

17.     Defendant, the United States Bureau of Land Management, is an agency located within the Department of the Interior. The agency administers over 245 million surface acres of public lands, most of which are in twelve Western states, including Oregon. Warm Springs HMA is located on BLM-administered public land, and the agency is responsible for ensuring that federally-administered actions within the HMAs comply with the requirements of all federal laws.

6

COMPLAINT

**JURISDICTION AND VENUE**

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331

(federal question). This action presents a case and controversy arising under the WHBA

and NEPA, federal statutes. This Court also has jurisdiction pursuant to 28 U.S.C. § 1346, as

the United States is a defendant.

19.     This Court has authority to grant Plaintiff's requested relief pursuant to 28

U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706

(Administrative Procedure Act).

20.     Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e). A

substantial part of the events giving rise to the claims occurred in this judicial district, as

the challenged Decision Record was issued by BLM's Burns District Office, which is located

in this judicial district. This case is properly filed in the Pendleton Division pursuant to LR

3-2 because Harney County is located within this Division.

**LEGAL BACKGROUND**

**A.     Wild Free-Roaming Horses and Burros Act.**

21.     In 1971, Congress passed the Wild Free-Roaming Horses and Burros Act

(WHBA), 16 U.S.C. §§ 1331 *et seq*., finding that "wild free-roaming horses and burros are

living symbols of the historic and pioneer spirit of the West; that they contribute to the

diversity of life forms within the Nation and enrich the lives of the American people; and

that these horses and burros are fast disappearing from the American scene." 16 U.S.C. §

1331. Upon finding this, Congress stated its policy was that "wild free-roaming horses and

burros shall be protected from capture, branding, harassment, or death, and to accomplish

COMPLAINT

this they are to be considered in the area where presently found as an integral part of the natural system of public lands." *Id.*

22.    The WHBA requires BLM to "protect and manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving, natural ecological balance on the public lands." 16 U.S.C. § 1333(a). Additionally, the WHBA requires management of wild horses and burros to be at "the minimal feasible level." *Id.*

23.    To do so, for each HMA, BLM must: (1) maintain a current inventory of wild horses in the management area; (2) determine the AML of wild horses that the HMA can sustain; and (3) determine the method of achieving the designated AML and managing horses within it. 16 U.S.C. § 1333(b)(1); 43 C.F.R. §§ 4710.2, 4710.3-1.

24.    BLM must manage wild horses "as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat." 43 C.F.R. § 4700.0-6(a).

25.     BLM must undertake management activities affecting wild horses "with the goal of maintaining free-roaming behavior." 43 C.F.R. § 4700.0-6(c); *see also* BLM WHB Handbook, § 4.1.2.

26.    Free-roaming is defined in the BLM WHB Handbook as wild horses that "are able to move without restriction by fences or other barriers within a HMA."

27.    When the WHBA was enacted, Congress specifically intended to deter the possibility of "zoo-like" developments.

28.    In limited circumstances, the WHBA allows the removal of wild horses. However, prior to gathering or removing any wild horses from the range, the WHBA

8

COMPLAINT

requires BLM to make a determination that: (1) "an overpopulation [of wild horses] exists on a given area of the public lands," and (2) "action is necessary to remove excess animals." 16 U.S.C. § 1333(b)(2). This decision must be based on all information "currently available" to the BLM at the time of the determination. *Id.*

29.     The WHBA defines the term "excess" as animals that "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

30.     The WHBA mandates that, when BLM is making a determination about whether an overpopulation exists, and action should be taken to remove excess animals, it should consult with various individuals. For example, BLM must consult with "qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies," as has been recommended by the National Academy of Sciences, and others that it determines have scientific expertise and special knowledge of wild horse and burro protection, wildlife management, and animal husbandry as related to rangeland management. 16 U.S.C. § 1333(a).

31.     BLM should conduct management activities affecting wild horses in accordance with approved land use plans. 43 C.F.R. § 4710.1.

32.     BLM management should be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans. 43 C.F.R. § 4710.4.

33.     BLM may establish conditions for the removal of unauthorized livestock from public lands adjacent to or within areas occupied by wild horses to prevent undue harassment of the wild horses. 43 C.F.R. § 4710.6.

COMPLAINT

B.      **The National Environmental Policy Act.**

34.     NEPA is our nation's basic charter for environmental protection.

35.     Congress enacted NEPA for two central purposes. First, Congress sought to

ensure that all federal agencies examine the environmental impacts of their actions before

acting. Second, Congress sought to provide the public with a statutory means to be

informed about, and to comment on, the environmental impacts of proposed agency

actions. *See* 40 C.F.R. § 1500.1. NEPA requires federal agencies to analyze the

environmental impact of a particular federal action before proceeding with the action. *See*

42 U.S.C. § 4332(2)(C).

36.     Accordingly, before a federal agency can act in a way that significantly affects

the quality of the human environment, NEPA requires the acting agency to prepare a

detailed environmental impact statement (EIS) that discusses, among other things: "(i) the

environmental impact of the proposed action; (ii) any adverse environmental effects; [and]

(iii) alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

37.     The EIS is the cornerstone of NEPA. An EIS is required for all "major Federal

action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c).

The requirement to prepare an EIS is broad and intended to compel agencies to take

seriously the potential environmental consequences of a proposed action.

38.     Whether an agency action is "significant" enough to require preparation of an

EIS involves "considerations of both context and intensity." 40 C.F.R. § 1508.27. The context

of the action includes factors such as "society as a whole (human, national), the affected

region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity "refers to

the severity of impact" and requires BLM to consider several factors including: impacts of

10

COMPLAINT

the action; unique characteristics of the geographic area; the degree to which the effects on the quality of the environment are likely to be highly controversial; the degree to which the effects on the environment are highly uncertain or involve unknown risks; the degree to which the action may have a precedential effect; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and the degree to which the action may have an adverse effect on endangered or threatened species or their critical habitat. 40 C.F.R. § 1508.27(b).

39.    Agencies may prepare an Environmental Assessment (EA) to determine whether a proposed action requires preparation of an EIS or warrants a finding of no significant impact.

40.    An EA must take a "hard look" at the potential consequences of agency actions and provide enough evidence and analysis for determining whether to prepare an EIS. Agencies must involve the public, to the extent practicable, in preparing this assessment. 40 C.F.R. § 1501.4(b).

41.    If the agency decides the impacts are not significant, it must supply a convincing statement of reasons why, and make its finding of no significant impact available to the public. 40 C.F.R. § 1501.4(e).

42.    A significant effect may exist even if the federal agency believes that, on balance, the effect will be beneficial. 40 C.F.R. § 1508.27(b)(1).

43.    Whether in an EA or EIS, an agency must adequately evaluate all potential environmental impacts of the proposed action. *See* 42 U.S.C. § 4332(2)(C). To meet this obligation, the federal agency must identify and disclose to the public all foreseeable

COMPLAINT

impacts of the proposed action, including direct, indirect, and cumulative impacts. *See id*. §

4332(2); *see also* 40 C.F.R. §§ 1508.7, 1508.8.

44.    After preparing an EA or EIS, an agency may not simply rest on the original

document. The agency must gather and evaluate new information that may alter the results

of its original environmental analysis and continue to take a hard look at the environmental

effects of its future planned actions. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 374

(1989).

**C.    Applicable BLM Directives on Wild Horses.**

45.    BLM's WHB Handbook explains that:

> Before issuing a decision to gather and remove animals, the authorized officer
> shall first determine whether excess WH&B are present and require
> immediate removal. In making this determination, the authorized officer shall
> analyze grazing utilization and distribution, trend in range ecological
> condition, actual use, climate (weather) data, current population inventory,
> wild horses and burros located outside the HMA in areas not designated for
> their long-term maintenance and other factors such as the results of land
> health assessments which demonstrate removal is needed to restore or
> maintain the range in a [thriving, natural ecological balance].

BLM WHB Handbook, § 4.3.

46.    According to the BLM WHB Handbook, a minimum population size of 50

effective breeding animals, or a total population size of about 150 to 200 horses, is

currently recommended to maintain an acceptable level of genetic diversity within

reproducing wild horse populations. BLM WHB Handbook, § 4.4.6.3.

47.    BLM's regulations provide that it can close public lands to grazing use by all

or a particular kind of livestock "if necessary to provide habitat for wild horses or burros,

to implement herd management actions, or to protect wild horses or burros from disease,

harassment or injury." 43 C.F.R. § 4710.5.

COMPLAINT

48.     BLM directives state that an appropriate NEPA analysis and issuance of a decision is required prior to removing wild horses. *See* BLM Removal Manual, § 4720.2.21(C)(6) ("An appropriate NEPA analysis and issuance of a decision is required prior to removing animals."); *see also id*. § 4720.3 ("[T]he authorized officer shall conduct an appropriate site-specific analysis of the potential environmental impacts that could result from implementation of a proposed gather in accordance with [NEPA].").

49.     BLM's guidance documents also specify that a key element of its analysis will be to make a determination of whether excess wild horses are present that require immediate removal. *Id*. § 4720.31.

50.     BLM's guidelines specify that roundup and removal decisions must be issued thirty-one to seventy-six days prior to the start of the proposed roundup. BLM WHB Handbook, §§ 7.1, 7.1.2.2.

51.     One of BLM's primary objectives for wild horse management is "[t]o ensure management activities are carried out at the minimum feasible level necessary to attain the objectives identified in approved land use plans (LUPs) and Herd Management Area Plans (HMAPs) and that free-roaming behavior is maintained." BLM, Wild Free-Roaming Horses and Burros Management Manual MS-4700 (2010), § 4700.02.

52.     The BLM WHB Handbook defines minimum feasible level of management as the "minimum number of habitat or population management tools or actions necessary to attain the objectives identified in approved [land use plans] and HMAPs for a HMA or HMA complex."

53.     According to BLM's regulations and WHB Handbook, HMAPs establish short and long-term management and monitoring objectives for a specific wild horse herd and its

COMPLAINT

habitat and are prepared with public involvement through a site-specific NEPA process. BLM WHB Handbook, §§ 2.5, 6, Appendix 4. HMAPs identify the actions to be taken to accomplish herd and habitat management objectives, such as identifying and setting objectives for herd composition, animal characteristics, and habitat development needs, and must be in conformance with the applicable LUPs. BLM WHB Handbook, §§ 2.5.2, 6; *see also* 43 C.F.R. § 4710.3-1.

54.    The objectives set forth in an HMAP guide future wild horse management activities in an HMA or complex over the life of the plan. BLM WHB Handbook, Appendix 4.

55.    The purpose of an HMAP is to facilitate on-the-ground implementation of the selected management strategy. The HMAP includes a Monitoring Plan and Tracking Log/Project Implementation Schedule. BLM WHB Handbook, Appendix 4.

56.    Future decisions implementing on-the-ground decisions, such as roundups and removals, must be based on current information, proper NEPA analysis, and public participation. *Id.* §§ 4.3, 4.4.6.4, 7.1, 7.1.2, 7.1.2.1; *see also* BLM Management Considerations Manual, MS-4710 (2010), § 4710.23.; BLM Removal Manual § 4720.3; BLM, National Environmental Policy Handbook, H-1790-1 (2008).

57.    According to the BLM WHB Handbook, land use plans should identify the areas to be managed for non-reproducing herds, and those areas must meet specific criteria, including: no special or unique characteristics, low ecological condition, limited public land water, and reliance on private water. BLM WHB Handbook, §§ 2.1.3, 4.5.4.1.

58.    According to the BLM WHB Handbook, because spaying mares involves major abdominal surgery, is risky, and requires good post-operative care, spaying mares should only be considered "if safe, effective and humane surgical methods and post-

14

COMPLAINT

operative care procedures can be perfected for use on wild horses." BLM WHB Handbook §

8.3.2.1.

## FACTUAL BACKGROUND

**A.    Warm Springs Herd Management Area.**

59.    Warm Springs HMA is located in Harney County, Oregon, approximately 25

air miles southwest of Burns, Oregon.

60.    Warm Springs HMA is within the administrative boundaries of BLM's Burns

District Office.

61.    Warm Springs HMA contains approximately 474,547 acres of BLM-managed

land.

62.    Elevations within Warm Springs HMA vary from 4,094 feet at Iron Mountain

Flat to 5,600 feet on Jack Mountain. Much of the HMA consists of moderate sloping

topography with only one deep canyon at the lower reach of Buzzard Creek.

63.    Precipitation in Warm Springs HMA averages between six to ten inches

annually, mainly in the form of snow, and temperatures vary from -30 degrees Fahrenheit

to 95 degrees Fahrenheit in the summer.

64.    The major vegetation types within Warm Springs HMA are low

sagebrush/Idaho fescue, big sagebrush/Idaho fescue, and big sagebrush/bluebunch

wheatgrass/Thurber's needlegrass with a few scattered junipers in the southeast corner.

To a lesser extent, there are silver sagebrush flats with Nevada bluegrass and small areas of

greasewood and spiny hopsage.

65.    Overall, forage has not been an issue for wild horses in Warm Springs HMA.

Although water is a limiting factor, water sources are found across the HMA.

COMPLAINT

66.    In 1971, when Congress passed the WHBA, wild horses were present in or near the area now designated as Warm Springs HMA.

67.    The appropriate management level (AML) for Warm Springs HMA was established in the 1979 Warm Springs Equine Herd Management Area Plan (Warm Springs HMAP) as a range from 111 to 202 wild horses, which includes a population of 15 to 35 burros. According to the Warm Springs HMAP, Warm Springs HMA encompassed 468,360 acres of public, state and private lands. The Warm Springs HMAP also discusses the construction of an east-west division fence in Fall 1977.

68.    The 1987 Drewsey, Andrews and Riley Management Framework Plan (MFP) Amendment resulted in a land use plan (LUP) decision that maintained the AML in Warm Springs HMA at 111 to 202.

69.    Following the LUP Amendment, an update to the Warm Springs HMAP occurred in December 1987, and established an objective to "[m]aintain a viable herd of 111 to 201 wild horses . . . [b]urros are still found in the west unit but no management objectives nor plans have been identified."

70.    The AML was again maintained as 111 to 202 wild horses, including 15 to 35 burros, in the 1992 Three Rivers Resource Area Management Plan (RMP) and Record of Decision (Three Rivers RMP/ROD).

71.    According to the Three Rivers RMP/ROD, wild horses in Warm Springs HMA are allocated 2,424 animal unit months (AUMs). According to BLM, this equates to an AML of 96 to 178 wild horses.

COMPLAINT

72.     In the 2010 Warm Springs HMAP Update, the most recent Warm Springs HMAP Update, BLM again maintained the established AML range of 111-202 wild horses, including 15 to 35 burros.

73.     The AML for wild horses in Warm Springs HMA has not changed since it was originally set in 1979.

74.     Wild horses in Warm Springs HMA have been rounded up fourteen times since 1978, most recently in 2010.

75.     Following the 2010 roundup, E. Gus Cothran from Texas A&M University, summarized that the genetic variability of this herd, in general, is on the high side but there was a high percentage of variation at risk, heterozygosity levels had declined since 2001. Additionally, comparison of two years of data indicated that diversity was in decline.

76.     According to BLM, in 2014, there were approximately 297 wild horses (253 adults and 44 foals) in Warm Springs HMA.

77.     According to BLM, a September 2016 aerial survey showed an estimated population size of 586 wild horses (513 adults and 73 foals). This would mean that the wild horse population grew by 260 adults and 29 foals, or a total of 289 horses, in less than two years.

78.     According to BLM, in June 2018, just one year and nine months after the September 2016 count, BLM counted an estimated 852 wild horses (694 adults and 158 foals). This would mean that the population grew by 181 adults and 85 foals, or a total of 266 horses, in less than two years.

79.     Two separate livestock grazing allotments with seven individual livestock grazing permits are within Warm Springs HMA.

17

COMPLAINT

**B.    The 1992 Three Rivers Resource Management Plan and Record of Decision.**

80.    The 1992 Three Rivers RMP/ROD affirmed that wild horses in Warm Springs HMA were to be allocated 2,424 AUMs. According to BLM, this equates to an AML range of 96 to 178 wild horses.

81.    According to the 1992 Three Rivers RMP/ROD, specific management actions arising from RMP decision will be compared with the RMP objectives to ensure consistency with the intent of the plan, and formal plan evaluations will take place at intervals not to exceed five years.

82.    The stated objective and rationale of the wild horse program in the 1992 Three Rivers RMP/ROD is to "[m]aintain healthy populations of wild horses" within Warm Springs HMA.

83.    According to the 1992 Three Rivers RMP/ROD, Warm Springs HMA encompasses 456,855 acres and 2,424 AUMs were allocated to the Warm Springs wild horses.

84.    According to the 1992 Three Rivers RMP/ROD, herd population inventories are to be conducted on an annual basis.

85.    According to the 1992 Three Rivers RMP/ROD, AMLs are to be based on the analysis of trend in range condition, utilization, actual use, and other factors.

86.    According to the 1992 Three Rivers RMP/ROD, NEPA documentation must be prepared "prior to any adjustments in population levels."

87.    According to the 1992 Three Rivers RMP/ROD, monitoring requirements include (1) annual collection of utilization, actual use, and climate reports; (2) long and

COMPLAINT

short-term trend in range condition studies conducted every three to five years; and (3) wild horse use area mapping and reporting.

88.    According to the 1992 Three Rivers RMP/ROD, another objective and rationale is to enhance the management and protection of the herds in Warm Springs HMA.

89.    According to the 1992 Three Rivers RMP/ROD, roundups must be based on current monitoring and other data.

**C.    Overview of the Proposed Sterilization Experiment.**

90.    In February 2018, BLM sent a Statement of Research Objectives (BLM's Research Objectives) to the United States Geological Survey (USGS) inviting USGS to prepare a proposal addressing research questions related to wild horse management. Specifically, BLM requested a proposal addressing using ovariectomy via colpotomy as a surgical method for wild horse population management.

91.    According to BLM's Research Objectives, the proposal was required to include a step-by-step description of the procedure, including sedation and other treatments that may be administered before, during, or after the procedure. Additionally, the research team was expected to arrange for a veterinary team that included practitioners experience with ovariectomy of horses via colpotomy, and with wild horse sedation. BLM expressly stated that USGS's proposal would be part of public documents form BLM's NEPA process.

92.    The two main research topics BLM asked USGS to address were: (1) Surgery Feasibility and Outcomes Assessment and (2) On Range Behavior and Outcomes Assessment. BLM also included a number of sub-questions regarding differences between treated and untreated mares, including questions regarding pregnancy stages, expected

19

COMPLAINT

outcomes of surgery (including pain), animal welfare impacts, and differences in mortality rates. Sub-questions also included questions regarding changes in on-range behavior and outcomes between treated and untreated mares.

93.    BLM received the USGS's Proposal for Research Effort (USGS Proposal) on May 18, 2018.

94.    BLM received a Supplemental Mare Spay Proposal in June 2018.

95.    In June 2018, funding was approved to proceed with the proposed Sterilization Experiment.

96.    The USGS Proposal included Colorado State University (CSU) as a partner in the experiment.

97.    The USGS Proposal did not include either a step-by-step description of the procedure or sedation and other treatments that may be administered before, during, or after the procedure.

98.    Although the USGS Proposal does give a brief background regarding immunocontraceptive vaccines, such as PZP, as well as an overview of utilizing sterilization in other species, it does not specifically address the surgical procedure ovariectomy via colpotomy in any species, including wild horses.

99.    The USGS Proposal proposed "to examine the impact of management actions conducted by the Bureau of Land Management (BLM) on mares." USGS states that it "will measure mare behavior and band fidelity demography (birth and survival rates), and spatial ecology (using radio collars and radio tags)." BLM also states that it will "evaluate the population-level effects of BLM management by comparing the managed population to an unmanaged control within the same habitat."

20

COMPLAINT

100.    According to the USGS Proposal, radio collars or tags would be used on mares only to locate animals to record behavior, births and deaths, body condition, and group composition throughout the year.

101.    According to the USGS proposal, during the Sterilization Experiment, all wild horses wearing a collar will be visually observed at least once a month during winter (October to march), and twice a month during spring/summer (April to September).

**C.    Environmental Review for the Sterilization Experiment and Ten-Year Plan.**

102.    On May 21, 2018, before BLM had secured any funding, BLM issued scoping letters regarding the proposed Sterilization Experiment and Ten-Year Plan. BLM received 2,044 scoping comments, including a scoping comment from Friends of Animals. A majority of the scoping comments opposed the proposed Sterilization Experiment and Ten-year Plan.

103.    On June 29, 2018, BLM issued a draft EA for the Spay Feasibility and On-Range Behavioral Outcomes Assessment and Warm Springs HMA Population Management Plan (Draft EA).

104.    The Draft EA identified the Sterilization Experiment proposed by the United USGS and CSU in cooperation with BLM's Burns District Office.

105.    The Draft EA proposed to allow the USGS and CSU to evaluate the safety, complication rate, and feasibility of ovariectomy via colponomy on wild horse mares and the impacts to mare and band behavior on the range as compared with an untreated herd.

106.    The Draft EA included two alternatives: No action (Alternative A) and the Proposed Action (Alternative B).

COMPLAINT

107.    The Proposed Action included two distinct phases: (1) the Sterilization Experiment (2018-2022) and (2) the Ten-Year Plan (2018-2028).

108.    Implementation of the Proposed Action would begin in the Fall of 2018.

109.    According to the Draft EA, Warm Springs HMA was selected for this experiment because it is divided into two large pastures with one main fence down the middle. Each side has comparable topographical, vegetative, and watering features. For the experiment, one side of the HMA would be the control segment with no sterilized mares, and the other side would be the treatment segment with treated mares. Each side would have a total of 100 horses.

110.    According to the Draft EA, the Proposed Action would begin with a helicopter roundup of all of the horses—100 percent of the population—within and around Warm Springs HMA.

111.    According to the Draft EA, all of the wild horses would then be transported to the Oregon Wild Horse Corrals Facility. Wild horses would then be selected for the experiment and kept separate from the other horses at the corrals.  All horses returned to the HMA would receive an individual freeze mark on their neck as well as a freeze mark on their left hip.

112.    According to the Draft EA, BLM would then transport horses back to Warm Springs HMA and put 100 horses on one side of the HMA (the control side) and 100 horses on the other side of the HMA (the treated side).

113.    According to Draft EA, "[b]oth the 'spay' (ovariectomy) procedure and the behavior observations portions of this study were presented to CSU's Institutional Animal Care and Use Committee (IACUC) in an Animal Care and Use Protocol. This IACUC, which is

22

COMPLAINT

made up of a panel of veterinarians and ethics officials, approved the protocol . . . . [and] CSU requires all research to exactly follow the methods approved in the protocol."

114.    According to the Draft EA, the Cooperative Ecosystem Studies Unit (CESU) contract with CSU requires federal agencies to follow regulations and policies established by the Host University (CSU) including, in this case, pertaining to veterinary surgical facilities and procedures.

115.    According to the Draft EA, all aspects of this Sterilization Experiment would be overseen by an experienced team made up of a professor of equine surgery specializing in minimally invasive surgery and wound healing; a veterinarian experienced in performing ovariectomy via colpotomy on feral mares; an animal welfare specialist experienced in pain management; an ecologist specializing in ungulate population dynamics; and a research scientist specializing in mammalian behavior and ecology.

116.    According to the Draft EA, approximately 28 to 34 mares would receive an ovariectomy and be returned to Warm Springs HMA approximately seven days later. In addition to the mares that would return to the HMA, approximately 70 more mares, would receive an ovariectomy, but would remain in captivity in the corrals. This means that approximately 100 mares would initially be sterilized overall pursuant to this experiment.

117.    According to the Draft EA, mares receiving ovariectomies would be adult females, three years of age and older.

118.    According to the Draft EA, ovariectomies would be conducted in November "to maximize the sample size of mares in their first and second trimesters of pregnancy."

119.    According to the Draft EA, CSU would then conduct post-surgery pain and welfare observations. The pain and welfare observations would include observations every

COMPLAINT

day for seven days after the surgery. Behavioral observation sessions would be conducted for one hour in the morning and afternoon and would include recording a score from a composite measure pain scale three times a day. The sample size for these behavioral observations would be twenty treated mares and twenty control mares. These would be randomly selected, but matched by age class, whether the mare is fitted with a collar, and presence of foal at foot. Every ten minutes during the one-hour observation periods, the basic state of each individual (i.e., feeding, standing, moving) and distance to the nearest horse in horse lengths would be recorded. All-occurrence sampling would be used to record social interactions (including nursing and blocking nursing), vocalizations, lying down, and drinking. Additionally, incidences of rolling, kicking/stamping, licking/chewing, yawning, the flehmen response, moving head to flank, and stretching would be recorded, as these can be associated with signs of discomfort in horses.

120.     In conjunction with the proposed Sterilization Experiment, BLM also proposed a ten-year population management plan for Warm Springs HMA.

121.     The proposed Ten-Year Plan included the proposed Sterilization Experiment, followed by a roundup to low AML at the completion of the study, and additional roundups and removals of wild horses over a ten-year period.

122.     Specifically, following the completion of the Sterilization Experiment and during the remainder of the ten-year timeframe of this plan, BLM would conduct additional helicopter roundups whenever the AML is exceeded. Considering the experiment calls for 200 wild horses (100 on each side of the HMA), and the AML for wild horses is only 96 to 178 wild horses, a helicopter roundup could be scheduled at any time during the ten-year

COMPLAINT

life of the plan. Additionally, smaller wild horse bait/water/horseback drive trapping roundups would occur between helicopter drive cycles.

123.    The first roundup following the Sterilization Experiment would be scheduled for 2022 and is estimated to be approximately 111 wild horses and burros. Subsequent roundup numbers will be determined at the time of the roundup. If, for any reason, BLM cannot conduct a roundup in 2022, it will roundup wild horses "regardless of population size" at any time.

124.    The Decision further authorizes BLM to conduct roundups at any time during the ten-year life of the plan.

125.    Two methods of fertility control for wild horse mares include use of porcine zona pellucida (PZP) and ovariectomy via colpotomy over the ten-year life of the plan.

126.    According to the Draft EA, if BLM determines that sterilizing horses via ovariectomy is not a proper management tool, BLM would utilize PZP as a management tool. If it determines that sterilizing horses via ovariectomy is a proper management tool, it will continue to conduct the surgeries through the life of the plan and possibly beyond.

127.    Following the completion of the Sterilization Study, BLM would assess whether analysis in this EA adequately support future actions (i.e. ovariectomies or PZP) or if BLM needs to prepare new or supplemental analysis.

128.    According to the Draft EA, BLM does not intend to conduct any additional NEPA analyses or invite the public to participate in any way over the next ten-years, and possibly more.

129.    BLM received a total of 8,326 comment emails, letters, and faxes on the Draft EA, including a comment letter from Friends of Animals.

COMPLAINT

130.    Friends of Animals and others commented that BLM did not consider a reasonable range of alternatives, including protecting natural predators in order to manage the population of wild horses in Warm Springs HMA using natural means.

131.    Friends of Animals and others commented that the Proposed Action meets the level of significance that triggers the preparation of an Environmental Impact Statement (EIS) that analyzes additional alternatives, including adjusting the outdated AML in Warm Springs HMA to support additional wild horses and reducing the amount of forage allocated to private ranchers for grazing domestic livestock within the HMA.

132.    Friends of Animals and others commented that the Sterilization Experiment would diminish the wild, free-roaming behavior of the wild horses.

133.    Friends of Animals and others commented that the Sterilization Experiment does not equate to managing horses at the minimal feasible level, as required by the WHBA.

134.    Friends of Animals and others commented that BLM cannot authorize the continued removal and harassment of wild horses for ten years into the future.

135.    Friends of Animals and others commented that, by performing this dangerous surgery, the wild horses will be highly traumatized and their health and lives will be endangered if permanent sterilization methods are allowed to be used for the management of wild horses.

136.    Friends of Animals and others commented that equine veterinarians warn that ovariectomy represents an unreasonable risk of harm to even domesticated horses under controlled conditions.

137.    Friends of Animals and others commented that complications of ovariectomies include postoperative pain, anorexia, depression, incisional swelling,

26

COMPLAINT

incisional infections, incisional dehiscence, eventration, peritonitis, intraabdominal

adhesions, and death. Other post-operative complications include postoperative

myopathy/neuropathy, wound infections, wound dehiscence [wound rupture], eventration,

[protrusion of the contents of the abdomen], vaginal adhesions, peritonitis [a potentially

fatal inflammation of the abdominal lining], wound infections, post-operative pain, and

hemorrhage.

138.    Friends of Animals and others commented that the use of PZP on wild horses

as a population management tool has been shown to have adverse effects on wild horses

and other nontarget horses, including the stallions and foals that were not the target of the

pesticide.

139.    Friends of Animals and others commented that the Draft EA does not

adequately consider the impact on the genetic diversity of the wild horses in Warm Springs

HMA.

140.    Friends of Animals and others commented that BLM must consider the

ethical impacts of its actions as well as the positive impact of wild horses.

141.    On August 8, 2018, CSU withdrew from the proposed Sterilization

Experiment.

142.    On August 9, 2018, Friends of Animals obtained the following official

statement from CSU explaining its reason for withdrawing from the Sterilization

Experiment:

> Colorado State University is an international leader in improving animal
> health, known world-wide for our leadership in managing animal-related
> research with the highest level of care and ethics. Objectively pursuing options
> to solve unmet needs in animal care, we seek to provide unique solutions to

27

COMPLAINT

stop animal suffering. As a state university, we have investigated alternative population and birth control measures for wild animals for more than 25 years, and remain committed to continuing to explore solutions to an unmet need. Our historic participation in these efforts involves consideration of many factors that are governed by internal and external experts in science, ethics and animal welfare. An important component of every research process is to engage in rigorous discussion and evaluation with our own experts as well as experts from outside of the university and listening to the concerns of the larger community as we bring these innovations forward. After careful consideration of multiple factors during the 30-day public comment period for the Warm Springs, Oregon, mare spay project, Colorado State University is withdrawing our partnership on the surgical spaying of mares. The project is led by the Bureau of Land Management and USGS. The decision to withdraw was made with the support of our involved researchers.

Although we withdraw from this particular effort, wild horse and burro overpopulation is a critical animal welfare issue that must be solved through objective, collaborative and transparent research. Our efforts include multiple approaches to solving this problem. Examples are the just released results of an eight-year study that provides initial, promising information about a birth control vaccine protocol for use in wild mares, and our ongoing research in observing wild horse behavior among overpopulated bands across the West. As an academic institution, we are committed to exploring this important animal welfare concern. We will continue to pursue alternatives that address wildlife welfare issues, leaving the door open to our future work.

Dr. Alan Rudolph, Vice President for Research

143.    On August 22, 2018, less than two weeks after CSU withdrew from the Sterilization Experiment, BLM issued an Updated Draft EA for public comment. BLM provided only twelve days for the public to submit comments on the Updated Draft EA.

144.    The Updated Draft EA provided that BLM is responsible for the roundups, contracting veterinarians to conduct ovariectomy via colpotomy, and monitoring the mortality and morbidity rates of mares treated. USGS is also responsible for radio collaring and tagging horses, studying herd genetics, and on-range behavioral observations.

145.    According to the Updated Draft EA, the experiment would no longer include a professor of equine surgery, an animal welfare specialist, and a research scientist.

COMPLAINT

Additionally, the veterinarians performing the ovariectomy via colpotomy would be contracted by BLM rather than CSU.

146.    The Updated Draft EA eliminated the post-surgery pain and welfare observations that would have been conducted by a CSU animal welfare specialist with the purpose of quantifying a measure of pain and discomfort in mares after surgery.

147.    According to the Updated Draft EA, the information that would have been gathered during the post-surgery pain and welfare observations will instead be evaluated by the BLM-contracted veterinarian.

148.    On August 30, 2018, Friends of Animals submitted supplemental comments detailing its concerns and urging BLM to cancel this experiment altogether.

149.    On September 12, 2018, just a little over a month after CSU withdrew from the Sterilization Experiment and only ten days after comments on the updated draft EA were due, BLM issued the Sterilization Experiment and Ten-Year Plan Decision Record, a final environment assessment (Final EA), and a Finding of No Significant Impact.

150.    In the Final EA, BLM did not adequately address the alternatives proposed by Friends of Animals.

**D.    BLM's Authorization to Conduct the Sterilization Experiment and Ten-Year Plan.**

151.    BLM did not commit to analyze grazing utilization and distribution, trends in ecological conditions, actual use, and climate data before making future decision under the Sterilization Experiment and Ten-Year Plan.

152.    BLM did not commit to provide public notice before undertaking future roundups under the Sterilization Experiment and Ten-Year Plan.

COMPLAINT

153.    BLM did not commit to provide public notice before undertaking future sterilization surgeries (i.e. ovariectomies) or any other type of fertility control method under the Sterilization Experiment and Ten-Year Plan.

154.    BLM did not commit to provide public participation in future roundup decisions under the Sterilization Experiment and Ten-Year Plan.

155.    BLM did not commit to provide public participation in future sterilization surgeries (i.e. ovariectomies) or any other type of fertility control under the Sterilization Experiment and Ten-Year Plan.

156.    The impacts and effects of the sterilization surgeries will be unknown to the public both during the experiment and after the experiment is completed.

157.    The pain and welfare observations will no longer take place due to CSU's withdrawal from the experiment, and therefore the pain and welfare of the wild horses will be unknown to the public during the experiment and after the experiment is completed.

158.    Range conditions, wild horse numbers, the AML, and the welfare of the impacts and effects of the sterilization surgeries could change each year.

159.    BLM does not have information that the removal of wild horses and ovariectomizing wild horses will be necessary throughout the ten-year life of the Sterilization Experiment and Ten-Year Plan.

160.    BLM failed to consider what qualified as a self-sustaining, healthy population of wild horses and how the Sterilization Experiment and Ten-Year Plan would impact the health and sustainability of wild horses.

161.    The impacts of ovariectomizing wild horses are controversial and involve unique and unknown risks.

COMPLAINT

## CLAIMS

## FIRST CAUSE OF ACTION

## (VIOLATIONS OF THE WILD FREE-ROAMING HORSES AND BURROS ACT)

162.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

163.    On the above facts and legal obligations, Defendants violated the WHBA by disregarding its duty to manage horses at the minimal feasible level.

164.    On the above facts and legal obligations, Defendants violated the WHBA by ignoring its obligation to conduct management activities affecting wild horses with the goal of maintaining free-roaming behavior.

165.    Defendant Sterilization Experiment and Ten-Year Plan is therefore arbitrary and capricious, an abuse of discretion, and not in accordance with law or procedure, and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

## SECOND CAUSE OF ACTION

## (VIOLATIONS OF NEPA:  FAILURE TO PREPARE AN

## ENVIRONMENTAL IMPACT STATEMENT)

166.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

167.    The implementation of the Sterilization Experiment and Ten-Year Plan constitutes a major federal action that will significantly affect the quality of the human environment, and therefore an Environmental Impact Statement is required under NEPA.

31

COMPLAINT

168.    The implementation of the Sterilization Experiment and Ten-Year Plan is highly controversial, highly uncertain, involves unique and unknown risks that have never been analyzed, and may have a severe precedential effect.

169.    Defendants failed to make a convincing case for its Finding of No Significant Impact.

170.    In issuing the Sterilization Experiment and Ten-Year Plan without an Environmental Impact Statement, Defendants actions are arbitrary and capricious, an abuse of discretion, and not in accordance with the law or required procedure and should be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

**THIRD CAUSE OF ACTION**

**(VIOLATIONS OF NEPA:  FAILURE TO TAKE A HARD LOOK AT THE SIGNIFICANT DIRECT, INDIRECT, AND CUMULATIVE IMPACTS OF THE PROPOSED ACTION)**

171.    Friends of Animals herein incorporates all allegations in the preceding paragraphs.

172.    Defendants failed to provide a full and fair discussion of the significant environmental impacts of the Sterilization Experiment and Ten-Year Plan.

173.    On the above facts and legal obligations, Defendants violated NEPA by failing to independently and adequately analyze the significant direct, indirect, cumulative, and site-specific effects of the decision to continually roundup, permanently remove, ovariectomizing, and/or administering PZP to the Warm Springs wild horses.

174.    In issuing the Sterilization Experiment and Ten-Year Plan without a complete and independent analysis of the direct, indirect, cumulative, and site-specific impacts of the proposed action and no action alternative, Defendants actions are arbitrary and capricious,

32

COMPLAINT

an abuse of discretion, and not in accordance with law or required procedures, and should be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

## FOURTH CAUSE OF ACTION

## (VIOLATIONS OF NEPA: FAILURE TO MEET REQUIREMENT FOR INFORMED DECISION MAKING AND INFORMED PUBLIC PARTICIPATION)

175.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

176.    BLM failed to properly respond to public comments thereby failing to engage in informed decision making and provide for meaningful public input as required by NEPA.

177.    In issuing the Sterilization Experiment and Ten-Year Plan without fostering informed decision making and informed public participation, Defendants actions are arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedures, and should be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

## FIFTH CAUSE OF ACTION

## (APA: UNEXPLAINED DEPARTURE FROM AGENCY POLICY AND GUIDELINES)

178.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

179.    BLM's policy mandates that BLM issue a site-specific NEPA document prior to each roundup.

180.    BLM's policy further mandates that a removal decision should be issued thirty-one to seventy-six days prior to removal.

COMPLAINT

181.    BLM's policy also states that land use plans should identify the HMAs to be managed for non-reproducing wild horses and that HMAs must meet specific criteria that would cause it to be selected for management of non-reproducing horses.

182.    The Three Rivers RMP/ROD requires that NEPA documentation be prepared prior to any roundup or removal action and that all roundup and removal actions be based on current data.

183.    Defendants failure to follow its own policies, without explanation, when issuing the Sterilization Experiment and Ten-Year Plan is arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedures, and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

**REQUEST FOR RELIEF**

Friends of Animals respectfully requests that this Court enter judgment providing the following relief:

A.    Declare that Defendants Sterilization Experiment and Ten-Year Plan violates the Wild Free-Roaming Horses and Burros Act and the Administrative Procedure Act;

B.    Declare that the Decision Record and Finding of No Significant Impact for the Sterilization Experiment and Ten-Year Plan violates the National Environmental Policy Act and the Administrative Procedure Act;

C.    Enjoin any action previously authorized by Defendants Sterilization Experiment and Ten-Year Plan at issue in this case unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

D.    Vacate and remand back to BLM the Sterilization and Ten-Year Plan;

COMPLAINT

E.  Award Plaintiff reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*., and/or all other applicable authorities; and/or

F.  Grant such further relief as the Court deems just and equitable.

Dated: October 18, 2018                    Respectfully submitted,

                                           /s/ Jonathan Smale
                                           Jonathan Smale, Oregon Bar No. 091518
                                           Field Jerger LLP
                                           American Bank Building
                                           621 SW Morrison Street, Suite 510
                                           Portland, OR 97205
                                           (503) 542-2015
                                           jonathan@fieldjerger.com

                                           /s/ Michael Ray Harris
                                           Michael Ray Harris (*pro hac vice* pending)
                                           Friends of Animals
                                           Western Region Office
                                           7500 E. Arapahoe Road, Suite 385
                                           Centennial, CO 80112
                                           (720) 949-7791
                                           michaelharris@friendsofanimals.org

                                           /s/ Courtney R. McVean
                                           Courtney R. McVean (*pro hac vice* pending)
                                           Friends of Animals
                                           Western Region Office
                                           7500 E. Arapahoe Road, Suite 385
                                           Centennial, CO 80112
                                           (720) 949-7791
                                           courtney.mcvean@friendsofanimals.org

                                           *Attorneys for Plaintiff*

COMPLAINT